Please the court. Theodore VanderWaal for appellant. Katherine Nury. Mr. VanderWaal, why don't we wait just a minute for your opposing counsel to get settled. Counsel, you ready to proceed? Yes. Very well. Go ahead. Your Honor, this case concerns the constitutional rights of a high school student, senior at the time, Katherine Nury, regarding the selection of an instrumental song as part of a performance at a graduation ceremony. Mr. VanderWaal, since we don't have a whole lot of time, maybe we can cut to some of the key issues here. Do you agree that if this is not a limited public forum, that at least your first cause of action founders? I believe it's much more difficult if it's not a limited public forum. It's impossible, isn't it? Your Honor, if this is a closed private forum, is there any basis at all to proceed on the freedom of expression cause of action? Your Honor, I'm not aware of any such authority. However, we do believe, obviously, that this was created. I know you'd like it to be created, but let's take it from there. I gather that you hang your cause of action on this first cause of action on the fact that from 2003, when the new band leader arrived and let the students make their choice of an instrumental piece to play at graduation, that that created the limited public forum. Is that correct? That's correct, Your Honor. Is there anything else besides that that you believe created a limited public forum in this setting? Well, Your Honor, in this particular case, what happened was not only did the school request that the students in the Wind Ensemble choose a song, but there was additional communication from Defendant Whitehead, who in the record it shows that she said that they rejected the Ave Maria case, or song, and requested that the students choose another song. So there's confirmation that they had a limited public forum. So you're saying the very fact that she allowed them to choose another song confirms the limited forum analysis that we should undertake? That's correct, Your Honor. She didn't reject that choice. She didn't come right out and say, well, the students don't have a choice here. I think her testimony was that her inquiry should have been interpreted as a directive, if I understand that correctly. She told them they couldn't do the Ave Maria. Do you disagree with that characterization of the record? Your Honor, her testimony was conflicting in that regard. She stated that, as you've described it, but she also stated that we request that the students choose another song. So she did both. Mr. VanderWaal, yesterday the Supreme Court issued a decision in Pearson v. Callahan that addresses the analysis that this court should follow under Saucier v. Katz in approaching Section 1983 action. Is there any reason why we even need to resolve the question of fora, whether there's even a constitutional right to play an instrumental religious song, if we can decide the case on qualified immunity grounds? Your Honor, I do believe that – well, first of all, I'm not familiar with the case that came out yesterday. I have to be honest with the Court there. So I'm not sure exactly what it says. I'm not trying to trap you. I'll give you a little primer here. The Supreme Court told us that rather than following a rigid order of battle, as Saucier v. Katz had been held to require, where we first determined that there's a constitutional right at issue, and if so, we ask under the second prong, the qualified immunity prong, whether or not a reasonable public official would have known that the law was clearly settled and that her actions violated a constitutional right. Correct. In the case decided yesterday, the Callahan case, we were told that the Court can approach this the same way we approach ineffective assistance of counsel arguments under Strickland v. Washington. If it's easier to decide the second prong of prejudice, we don't have to decide whether or not the action by the attorney breached the legal standard of care. So in essence, we could duck this difficult issue as I read the Callahan case, which is why I was interested in your observations on it. We wouldn't have to decide whether or not there's a constitutional right of a student to play a religious instrumental song at graduation if we could simply say no reasonable school official could have known that at this time. I wonder if I could ask my colleagues if we could ask both counsel to submit supplemental briefing on the issue of the impact of the Pearson v. Callahan case, if any, on the qualified immunity issue in this case. It is brand new, just came out, but you can pick it up off the SCOTUS site. And I think we would all benefit from your and your opposing counsel's view on this because, as Judge Tallman indicated, we do have a little flexibility under the Saussure doctrine. I'm not sure I quite understand what the Supreme Court did in this case. There seem to be others that share that same view. But whatever they did, we'll be interested in your view of what they did. All right. Would you like 28J? All right. So it is clear, counsel, you may, if you wish, submit under Rule 28J of the rules of this court, a supplemental letter, not more than 10 pages in length, addressing the impact of the Supreme Court's decision yesterday in Pearson v. Callahan, which is number 07-751. And if you would have that to us within two weeks of today's date, that should help the panel in its evaluation of the legal issue. Okay. Counsel, does it make any difference in this case that the music we're talking about was, when originally written, was to match the Latin language? Actually, Your Honor, when this case was originally written, it was a fireman's chorus. It's a secular song completely. It did not arise in the church, and it wasn't in Latin. It was a fireman's chorus. Was it written to the English language, the music? I don't know the answer to that question. But it was not in a religious context that this song was first composed. I've heard the piece performed orally where it goes on quiescent chalice, for example, and I'll bet nobody in the courtroom knows what that means. If I saw it written out, I might. I took two years of Latin. Your Honor, I do believe in this particular case. The objection that the school had, the disapproval of the religion that the school district had here, was simply inputting the two Latin words into the program. Well, hail Mary. What's wrong with that? I can say that to somebody whose name is Mary and greet her on the street. What is wrong with that? There's nothing wrong with that. If someone even knows the other. It's a football term. Or hail to the chief. Is that judicial notice? It's a type of pass. Only at Notre Dame football games. Well, first of all, Your Honor, I believe when the administrators were having a discussion whether or not to censor this song from the graduation ceremony, none of them realized or none of them knew the record shows what Ave Maria meant. They thought it had some religious connotation, but none of them knew for certain what it meant. If they didn't know, as educated educator administrators, how was the common person who was going to attend this graduation going to be offended by two little Latin words in the graduation program? Counsel, I have a quick question for you. You know, being a principal today is just tough. I mean, they're wrestling with all kinds of issues, particularly legal issues they never had to do 50 years ago. And as you know, our case law takes pity on them to some degree, indicating that when they wrestle with these issues, they're given a certain amount of latitude. Does the fact, as the record indicates, that the school had some complaints, I believe the year was 2005, which would have been the year just before this 2006 graduation, there were some complaints by people in the audience about what they viewed as a religious reference. Does that have any bearing on the decision in this case and the decision of the school principal? Your Honor, I don't think it should or would. Under the establishment clause, it's required that the school district demonstrate neutrality towards religion, not advancing it and not inhibiting it. Now, in this particular case. Well, that's a wonderful legal term, but practically speaking, the principal, as I understand it, was advised when they wanted to print the program that these words were there. Somebody brought it to her attention. They had a meeting. They talked about it. And what they were trying to do was to avoid another controversy. You're saying it's either for religion or against religion by making this decision. That puts them in a catch-22, doesn't it? Your Honor, they should not be subject to the political contest of who can write letters to the editor the most. Certainly here, the. . . It's a fact when you're a principal that you want to be sensitive to community concerns, isn't it? Absolutely. But those community concerns cut both ways. You have people like Catherine Nury and the other ensemble members who were very offended that they deprived them of their constitutional rights. That's another thing I'm interested in. My impression from reading the record was that they did not have any religious intent in picking this song. They just liked the song. That's correct. So how does she have a religious claim, if you will, when she didn't even care about the religious aspect of it? Your Honor, that's a good point. First of all, the Court obviously realizes we did not assert a claim for free exercise of religion. This is not a free exercise case. It's an Establishment Clause case, and it's a free speech case. In this particular case, the question is do we look at the intent of the purveyor of the speech, or do we look at the intent and the philosophy and perspective of the governmental entity? In this particular case, we have to look at what the government did, not the original intent of Ms. Nury. And if the Court looks at what the government did in this particular case, what the government did was it showed a disapproval of religion. Well, did it? Chief Judge Lasnik at the district court level found that the school district's action was motivated by an effort to avoid controversy over the issue, to maintain, as Superintendent Whitehead indicated, neutrality in the face of potential controversy. The Ninth Circuit has recognized the Establishment Clause defense, which the superintendent invokes here, which allows public officials to take steps in order to maintain that neutrality by simply ensuring that graduation is purely a secular event. Why shouldn't we allow, as Chief Judge Lasnik did, below that defense to bar your claim? Because, Your Honor, under the Ninth Circuit cases of Hills, which is a 2003 case, and Cole v. Oroville, which is a 2000 case, this Court actually required that there be an actual violation. In this particular case, the school district cannot establish or prove or demonstrate that there would have been an actual violation had the two Latin words been printed in the graduation pamphlet. As I understand it, the district court suggested that perhaps we ought to clarify or modify that to some degree and permit a reasonableness defense, that if the official acted in a reasonable belief that she was attempting to avoid an Establishment Clause violation, that that should still be recognized as a defense. That's correct, Your Honor. That's what Judge Lasnik did. There really wasn't authority to do so. And we think even under his analysis, the forbidding of this song in the graduation program didn't meet his own test, that in this particular case it was totally unreasonable for the school district to prohibit the printing of these two words in the graduation program and the playing of this strictly interminabilist piece. Counsel, did you want to save a couple of minutes? Yes, Your Honor. All right. Why don't we hear then from the attorney for the superintendent, Ms. Whitehead. Mr. Patterson? Thank you, Your Honor. On behalf of the appellee, Dr. Whitehead, good morning. This case does really focus on the difficulty that an administrator, and especially a superintendent, has to struggle with finding the balance between tolerating student speech and avoiding the appearance that they're promoting religion. Obviously, the question was asked about the derivation of Ave Maria, but it is clear that that derivation, as it presently stands, is that it is firmly connected with the Catholic Church. It's part of their prayer. It's Hail Mary. My son actually plays for Notre Dame, so I know he's called me and he said, we need a lot of Ave Maria, but they didn't get them. Mr. Patterson, I wonder if I could explore something with you. You know, even recognizing our jurisprudence on this issue, I fear we are becoming a nation of cultural Philistines. Isn't it correct that the term Ave Maria, I printed this out in Wikipedia, I find a whole page of Ave Marias from Beyonce to rock music people, and so I have absolutely no religious context at all. I find, let me just ask you this question. Isn't it correct that if you apply the measure that Principal Whitehead did, that most of the music from the medieval period, a good part of the music from the Renaissance, much of Bach, lots of Mozart, Beethoven, Haydn, Handel, would all be prohibited in this high school because it was either religiously based in far as the name, like a mass or a requiem, or because it was done to curry favor with a church official? I would agree with you. I think we have become very restrictive, but here is the conundrum that a superintendent finds themselves in when they're faced with Hazelwood and they're faced with the Lemon Test and they're faced with innumerable circuit court decisions and U.S. Supreme Court decisions coming down on free speech and religion and establishment and equal protection. And you're correct. About 60 to 70 percent, I think, of songs have some religious derivation. As colleges and universities used to have when they began. That has changed dramatically. But we are dealing with a graduation ceremony, which has been acutely determined to be a government speech, I believe, because it is firmly controlled. I mean, that agenda is curiously gone over in detail. You dispute the limited public forum characterization. We do. But for purposes of argument today, we are adapting and adopting Judge Lasnik's assumption, for purposes of summary judgment, that we're dealing with a limited public forum. Let me move you back a previous time. My understanding is that before 2006 that the band played Hymn Song by Philip Bliss. Is that correct? Do you know what the word hymn means? It has some religious connotation. Indeed, it does. Let me quote to you from the Oxford English Dictionary. A hymn is a song of praise to God. Any composition in praise of God which is adapted to be chanted or sung, specifically a metrical composition adopted to be sung in a religious service, sometimes distinguished from a psalm or anthem as not being a part of the text of the Bible. Why wasn't Hymn Song likewise banned as a religiously themed musical instrument, or number rather, in the previous years? Your Honor, I do not know the answer to that question and whether or not it was challenged. We do know that in the previous graduation year that there was a song that was sung, I think it was above and over your head, where there was some connotations and certainly language related to God and certainly there was a review of the actual title of that song, but the content of the song was not gone into, unfortunately, at that point in time. I can tell you that there was at least an article that appeared in the Everett Herald indicating that somehow Superintendent Whitehead was promoting religion. Again, I have a lot of sympathy for the principal, I really do. But I guess what I'm struggling with here, this is not a choral number. There were no religious words spoken. You've got the term Ave Maria, which I would wager today probably 99% of the population has no concept what that means in Latin, other than maybe the football term. And yet they don't know what a hymn song is either. And it's like, if I may use a religious phrase out of the Bible, it's like we're straining at a gnat and swallowing a camel. I just worry in this context, where we're talking about instrumental music, whether we're not being too careful. There is nothing that a principal can do, just like with us. However, we decide someone's going to be offended. To some degree, principals are in the same situation. And I just wonder in our jurisprudence here, are we asking you, are you asking us to be too careful that we, by being politically correct, we sweep a vast amount of culture that is of value to us off the table? Well, and it's a value, and I might point out, and the record clearly indicates, that Ave Maria was in fact played at some musical concerts. It certainly was played with secular songs as well. The venue here was much different, as was pointed out in the Lasande case and the Cole case and the Lee case, insofar as graduations are concerned. But I can tell you this, Judge, is that I cannot tell my client to be not careful enough in this situation. We have already got budget constraints, and every time I stand up here, we've got one more teacher out of that classroom. And I've got to tell my client, you've got to be careful. You can't bring on a lawsuit because they're expensive. So your hands are tied to some degree by the law. They are. Would you apply the same rule against the head of the manager of an educational facility as you would to a teacher who is doing medieval music training? No. If the song was Ave Maria in both instances, we'd have a different rule? That's my understanding. As long as it was presented in both a secular and non-secular way. In other words, there's a big difference between what is being presented in the classroom, insofar as whether or not there's educational process going on here, secular, non-secular, versus what happens in a graduation context. So your policy is flexible enough that it permits the playing of religious music for a legitimate pedagogical? Yes. In fact, that happened. If it's balanced. If it's balanced. And it was the students that selected the piece based on their training and what they had studied during the year. Right? It wasn't the superintendent's election to have this piece played. He vetoed it. It was vetoed by the superintendent. Correct. But the selection, as I understand it from Catherine Nury's testimony, was that it was not selected for its religious connotation, but rather because it sounded beautiful. So I'm not so sure that that was the context in which it was brought up, but it was certainly brought up in the context of the musical ear and from the hearer's standpoint. I wonder if we could go to the second, the establishment clause, cause of action. While the first prong of Lemon clearly seems to be met here, I have some question about the second and the third prong. I want to focus, though, on the third prong, which is action that results in an excessive entanglement between government and religion. We talked a little bit ago about how many Ave Marias there are out there and the issue of hymn song. Doesn't this actually require the superintendent and the school to decide what is and is not religious? Well, certainly that debate has come up, and certainly the one case that was cited, I believe it was a tax evasion case, had that debate as to what was religious or not religious. But certainly in this context, I think Ave Maria, at least if you even take a look at the dictionary, will even tell you it has its connotations in the Catholic Church, and certainly that's one of their major prayers. I respect that. But I'm just wondering, though, if you look at the record, it seems like there was some confusion in the meeting about what it meant. There was just this kind of vague concept that maybe it was religious and they ought to kind of avoid it. But if this is the test, if we say, you know, having Ave Maria played by an instrumental group at a graduation ceremony is sufficiently obnoxious that we're not going to let anybody do that anymore, it basically means that principals hereafter are going to have to decide if somebody wants to play some Hindu melody, whether it was religiously based or something from almost any music at all may at some point have been religiously based. Doesn't that get the principal in the business of making that kind of decision, which is possibly a violation of the third prong of Lemon? Well, Your Honor, I don't believe it does, but certainly I don't think that there's a necessity, by the way, that you prove that the Establishment Clause is going to be violated if you allow that to go forward. And if that were the test, I think it would put the Establishment Clause on its ear because it would be very circular. But the point was that the principal here in indicating that Ave Maria, despite the fact that it was going to be an instrumental, was going to be listed on the program. And the suggestion was made, well, why don't we just take that off? And the point was is we're not going to take that off because that wouldn't be truthful, that would be deceptive, and we're not going to allow that because we want to be transparent. So now the graduation program becomes an SEC filing. Well, I will only ask you that you've got to give us more direction than Hazelwood and Lemon and all of these because otherwise I can't advise my client to allow this to happen with the fact that it's going to cost us a great deal of money to defend these cases. The problem that I have in trying to figure out where we draw the line is what would you do, for example, if Ms. Nury had come back and said I would like to play from Beethoven's Ninth Symphony, Ode to Joy. There's nothing in the title that suggests that it might be religious. You would actually have to know something about the history and the lyrics, but this is going to be played as an instrumental piece. What would your advice be to Superintendent Whitehead if Ms. Nury had proposed Ode to Joy? If, in fact, I thought that there was a likelihood that there would be an article in the newspaper and that indeed somebody might bring a claim, I would advise her that you better take the safe side and you better do exactly what Deputy Superintendent Karsnas did and said, I'm requesting that music selections for graduation be entirely secular, or you increase your graduation program and allow both secular and non-secular music to occur. But that's not the purpose of graduation. The music is simply an augment to that graduation, and it's not a musical. With regard to the qualified immunity, and certainly we will submit that brief, but I think Judge Lasnik was very careful in his analysis and indicated, and I agree with the Supreme Court on this, is that if it's easier to get to the qualified immunity and protect the Dr. Whiteheads of this world, then we ought to go to that, and certainly the qualified immunity would strictly apply here. I mean, if somebody can tell me that any superintendent in this country understands the laws about what apply insofar as free speech and religious and establishment clause, I'll hand it to you. And certainly we've got four amici briefs here that certainly have differing viewpoints on that issue as well. One of the things that would help me, and I'll direct this to both counsel, if we follow the Supreme Court's suggestion and we decide that the qualified immunity attaches in this case, that doesn't answer the request that Mr. Patterson is making that we clarify for school officials what is or is not permissible next time down the road. Because all we would be saying is that in this case, no reasonable school official could have known that she was breaching a constitutional right. It would give no direction to other school officials in the next case when ode to joy is suggested what they should do. So if you can help us in your supplemental pleading and address that problem, that would be helpful. Okay. I would also, following up on Judge Tolman's question, I would be interested, I am interested in your take on the district itself. The superintendent, that's one matter. The other is the school district itself. From your perspective, is there any distinction as far as qualified immunity is concerned? Can the superintendent be granted qualified immunity and not the school district itself? Possibly. And I think Judge Lasnik addressed that issue. And the question that then comes into play is whether or not Dr. Whitehead is the final policymaker in that context. And we really didn't get to that and didn't address that. But I think what this argument and certainly the amicus briefs point out here is that we absolutely need some direction in this regard. But as far as Dr. Whitehead's decision here, she indeed did not violate the Constitution. She's protected by qualified immunity. And certainly Judge Lasnik's opinion should be affirmed. Thank you very much, Mr. Patterson. Thank you. Mr. Vanderbilt, you get the last word. Yes, Your Honors. I hear from counsel the struggle that the administrators have, and I'm somewhat sympathetic to it. But I'm also sympathetic to my client's position, where she has chosen this particular song as part of trade, tradition, custom, and a policy and practice, and the school has deprived her of her rights. But the problem, as I understand it, is your client testified that she didn't really choose it for religious purposes. She wanted to play it because it's a beautiful piece. However, when the school district made its decision, it infringed upon her constitutional rights because of the language. It was her speech that was in question. And the school district came against her on it because of the religious connotation that the school district placed upon it. Her speech or the title to the piece? Well, the title. Does this whole case turn on simply listing in the program the words Ave Maria? I believe it does, Your Honor. It really seems to me that it's almost circular because she started off saying that she didn't have any religious basis for this. Once the superintendent indicated we're not going to do this because of the concern about religious involvement, then she becomes concerned. Is that incorrect about the religious aspect of it? It's the way you described it, Your Honor. She had a right. As given by the school, she had a right to choose a song. And the question is, why was that right deprived from her? Wait a minute. Is that a right or is that just part of the educational process? Come on. Well, in this particular case... The one that got the idea that the students had been spending a semester doing classic music. Correct. That they should select the piece for their class. It's no more formal than that in terms of it's not a right. It's part of the educational process at that level. Your Honor, at the point that the teacher opened it up, and it was opened up for four years, it became a limited public forum. And at that point, it was a different situation. The facts in this particular case are for four years the school opened this up to these seniors on the wind ensemble. In this particular case, they decided that they didn't like the selection. Essentially, what the school district is asking for here is some kind of a whiff test. If there's a whiff of religion, whether it's in a newspaper article or whether it's in a lawsuit or whatever, if there's a whiff of religion, then we need to prohibit it. That's the conservative approach that Mr. Patterson is advocating. And that does not comport with the Establishment Clause of the U.S. Constitution. Let's go back to the first cause of action, though. That was a freedom of expression matter. Let's say that your client and her fellow students wanted to play Ave Maria, and they got in the council, and it turned out that the superintendent had a relative named Ave Maria, that she just couldn't stand and didn't want to be reminded of that person. And so she said, I just don't want this. I don't like it. It had nothing to do with religion. Would her freedom of expression be likewise trammeled from your perspective? Your Honor, there I think it would be different. And why is that? Well, the basis there is different. The basis is not one that goes to religion and an administrator determining what is religion and what isn't religion or disapproving of a particular religion. In that particular case, it's a – it's not a constitutional issue. There's a rational basis for that type of decision. In this particular case, there was no rational basis. But the rational basis, and I think under our case law it's substantiated, as your co-counsel indicated, he's going to tell the superintendent if there's any potential religious connotation to a number, he's going to advise her, you know, you better not do that because we're going to probably get sued, and I'm going to have to spend my money, and we're going to take the school district, your money, take the money from the school district, you have one less teacher, so many less books. What's wrong with that? Why shouldn't he be able to do that? Why shouldn't she be able to respond to that caution? Your Honor, I understand that, and I think that's poor advice with all respect. On his part or our part? On his respect, with all due respect to – yeah, with all due respect to counsel. Counsel, your time has expired. I'll let you make one final comment. The reason, Your Honor, is what we see in this particular case. There is a lawsuit. There is a lawsuit over this particular issue. And is it the fact that there's a potential of litigation? Does that govern and control? It should not. Under the Establishment Clause, it should be a question of neutrality. Who's to say that there aren't 300 other Catherine Nurys out there and that each one of their lawsuits is entitled to just as much deference as a lawsuit by someone who's writing to the editor who's part of this vocal minority? Her rights are just as strong as anyone else's. Thank you, counsel. Thank you. The Court appreciates the argument on both sides. We'll look forward to your supplemental decisions, cases submitted for decision, and we'll get you an answer as soon as we can. Thank you. We will next.
judges: Beezer, Tallman, Smith